UNITED STATES DISTRICT COURT

DISTRICT OF HAWAII

JAMES MANDEVILLE,

               Plaintiff,

    vs.

DEPARTMENT OF EDUCATION, STATE
OF HAWAI'I, KEITH T. HAYASHI,
INTERIM SUPERINTENDENT OF HAWAII
SCHOOLS,

          Defendants.

CIV. NO. 21-00468 LEK-WRP

**ORDER DENYING PLAINTIFF'S APPEAL AND
AFFIRMING THE HEARINGS OFFICER'S NOVEMBER 1, 2021
FINDINGS OF FACT, CONCLUSIONS OF LAW AND DECISION**

On November 26, 2021, Plaintiff Maria Mandeville

("Mother" or "Plaintiff"), individually and on behalf of her

minor child, J.M. ("Student" and collectively "Petitioners"),

filed her Complaint.[1]  [Dkt. no. 1.]  Plaintiff brings this

action pursuant to the Individuals with Disabilities Education

Act of 2004 ("IDEA"), 20 U.S.C. § 1400, *et seq.*  Plaintiff

appeals from the Administrative Hearings Officer's ("Hearings

---

[1] J.M.'s father, James Mandeville ("Father"), was
substituted as Plaintiff in this case after Mother's death.  See
Plaintiff-Appellants' Statement Noting Death of Party, filed
2/7/22 (dkt. no. 28); Motion for Substitution of Party Under
Fed. R. Civ. P. 25(a), filed 2/7/22 (dkt. no. 29); EO, filed
2/8/22 (dkt. no. 30) (granting the motion).

Officer") November 1, 2021 Findings of Fact, Conclusions of Law and Decision ("Decision" and "Appeal").[2]

On April 13, 2022, Plaintiff filed the Opening Brief. [Dkt. no. 40.]  Defendants Department of Education, State of Hawai`i ("the DOE") and Keith T. Hayashi, Interim Superintendent of Hawai`i Schools ("the Interim Superintendent" and collectively "Defendants" or "Respondents"), filed their Answering Brief on May 27, 2022.  [Dkt. no. 41.]  The Appeal has been considered without a hearing pursuant to Rule LR7.1(c) of the Local Rules of Practice for the United States District Court for the District of Hawaii ("Local Rules").  On July 13, 2022, this Court issued an entering order informing the parties of its ruling on the Appeal.  [Dkt. no. 43.]  The instant Order supersedes that entering order.  Plaintiff's Appeal is hereby denied and the Decision is hereby affirmed for the reasons set forth below.

## **BACKGROUND**

J.M. is a student who is eligible to receive special education services under the IDEA.  [Complaint, filed 11/26/21 (dkt. no. 1), at ¶ 7; Answer to Complaint Filed on November 26,

---

[2] The Decision, including its Legend, is available in the Administrative Record on Appeal, transmitted on January 11, 2022 ("AR"), at 532-633.  [Dkt. no. 12-53.]

2021, filed 12/20/21 (dkt. no. 7), at ¶ 6 (admitting those parts of ¶ 7)].

At the time of the Decision, J.M. was seventeen years old.  He has been diagnosed with autism spectrum disorder ("ASD") and generalized anxiety disorder.  As of the date of the Decision, J.M. had been attending a private learning center ("Private Center") for approximately nine years.[3]  The Private Center is not a school, and the classes taken there cannot be transferred to a DOE school as credits toward a diploma. [Decision, AR at 550-51 (dkt. no. 12-53 at PageID.652-53).]  The Hearings Officer stated J.M. "first began attending Private Center when an incident happened to Student in second grade and [Mother] did not want Student to continue attending public school." [Id. at 551 (dkt. no. 12-53 at PageID.653).]  A prior administrative decision found "'Student was bullied by other students on several occasions even though he had counseling and a one-to-one (1:1) aide with him at all times.'" J.M. v. Dep't of Educ., State of Hawai`i, 224 F. Supp. 3d 1071, 1075 (D. Hawai`i 2016) (quoting 2015 decision at 3).[4]

_____

[3] The Private Center is Maui Autism Center.  [Decision Legend, AR at 533 (dkt. no. 12-53 at PageID.635).]

[4] The CM/ECF version of 224 F. Supp. 3d 1071 is part of the administrative record in this case as an exhibit to Respondents' memorandum in opposition to Mother's motion regarding stay-put reimbursement.  See AR at 89-135 (dkt. no. 12-11 at PageID.149-
                                                    (. . . continued)

In an October 24, 2014 decision, a hearings officer: found that J.M. was denied a free appropriate public education ("FAPE") because the bullying at what was his DOE home school at that time substantially restricted his learning opportunities; found that the Private Center was appropriate; and awarded reimbursement.  However, an individualized education program ("IEP") was developed after the 2014 decision which called for J.M. to return to what was his home school at that time ("11/24/14 IEP").  <u>J.M.</u>, 224 F. Supp. 3d at 1075-77.  In a 2015 decision, a hearings officer concluded that the 11/24/14 IEP offered J.M. a FAPE.  <u>Id.</u> at 1080-81.  This Court affirmed the 2015 decision but granted the request for stay-put relief during all judicial review proceedings challenging the 2015 decision.  <u>Id.</u> at 1094.  This Court's December 1, 2016 order was affirmed on appeal.[5]  <u>J.M. ex rel. Mandeville v. Matayoshi</u>, 729 F. App'x 585 (9th Cir. 2018), <i>cert. denied</i>, 139 S. Ct. 923 (2019).

95) (<u>J.M. et al. v. Dep't of Educ., State of Hawai`i, et al.</u>, CV 15-00495 LEK-KJM, Order Affirming the Hearings Officer's September 9, 2015 Findings of Fact, Conclusions of Law and Decision; and Granting Plaintiffs' Request for Stay-Put Relief, filed 12/1/16 (dkt. no. 44)).

[5] This Court's December 1, 2016 order in <u>J.M.</u> was overruled as to the analysis of the adequacy of the transition plan for J.M.'s return from the Private Center to what was his home school at that time.  <u>See</u> <u>R.E.B. v. State of Hawai`i Dep't of Educ.</u>, 870 F.3d 1025, 1027 (9th Cir. 2017).  However, the <u>R.E.B.</u> panel granted rehearing and withdrew 870 F.3d 1025.  886 F.3d 1288 (9th Cir. 2018).  The panel subsequently issued a memorandum disposition which did not address this Court's

(. . . continued)

Mother initiated a due process request during the 2018-2019 school year, and she ultimately entered into a Compromise and Settlement Agreement, dated November 1, 2019, with the DOE ("Settlement Agreement").  See AR at 142-51 (dkt. no. 12-11 at PageID.202-11).  At the time of the Settlement Agreement, Mother's second amended due process request, submitted on or about August 21, 2019, was pending.[6]  [Id. at 142 (dkt. no. 12-11 at PageID.202).]  One of the terms of the Settlement Agreement was that the DOE agreed to pay J.M.'s tuition at the Private Center for the period from May 1, 2019 to October 31, 2020.  [Id. at 143 (dkt. no. 12-11 at PageID.203).]  The DOE continued to pay for J.M.'s tuition and related services at the Private Center until it offered J.M. what it considered to be a FAPE, and the proposed services were scheduled to start in April 2021.  [Decision, AR at 566 (dkt. no. 12-53 at PageID.668).]

IEP team meetings were held on October 20, 2020, February 25, 2021, and March 18, 2021, and an IEP was created

December 1, 2016 order in J.M.  See R.E.B. v. State of Hawai`i Dep't of Educ., 770 F. App'x 796 (9th Cir. 2019).

[6] It appears that the disputes which were resolved in the Settlement Agreement arose from the April 8, 2019 Prior Written Notice of Department Action ("4/8/19 PWN") and the March 29, 2019 Individualized Education Program ("3/29/19 IEP").  See AR, Petitioners' Exh. 1.3, AR at 37-57 (dkt. no. 13-1 at PageID.746-66) (4/8/19 PWN and 3/29/19 IEP).

("3/18/21 IEP").  See Petitioners' Exh. 1.22, AR at 258-81 (dkt. no. 13-4 at PageID.817-40).[7]  A Prior Written Notice of Department Action was issued on March 30, 2021 ("3/30/21 PWN"). See Petitioners' Exh. 1.23, AR at 282-85 (dkt. no. 13-5 at PageID.842-45).

Prior to the October 20, 2020 IEP team meeting, the DOE high school that was designated as J.M.'s home school ("Home School") prepared a draft IEP,[8] which was sent to all of the team members.  Further, after each meeting, the draft IEP was updated, and the updated draft was sent to all team members prior to the next meeting.  See Decision, AR at 566-67 (dkt. no. 12-53 at PageID.668-69) (citing Transcript of Proceedings Volume II (taken 9/28/21) ("Trans. VI"), filed under seal 1/11/22 (dkt. no. 22), at 945-46 (dkt. no. 22-1 at PageID.3302-03).

Ultimately, the 3/18/21 IEP stated that J.M. would be provided with 1860 minutes per week of special education services and 945 minutes per quarter of counseling services. [Petitioners' Exh. 1.22, AR at 276 (dkt. no. 13-4 at

---

[7] Although not reflected on the 3/18/21 IEP, the IEP team also met on November 12, 2020 and December 3, 2020.  See AR, Decision, AR at 566 (dkt. no. 12-53 at PageID.668) (citing Petitioners' Exhs. 7.1 to 7.5; Respondents' Exhs. 195 to 199 (recordings of meetings)).

[8] The Home School is Maui High School.  [Decision Legend, AR at 533 (dkt. no. 12-53 at PageID.635).]

PageID.835).]  It also stated J.M. would have "Close Adult
Supervision" ("CAS") on a daily basis, and it described the CAS
services as follows:

> Staff implements breaks, engages [J.M.] in
> conversation, redirects him back to tasks,
> prompts him to get back to the task at hand,
> checks-in.  For safety reasons: CAS needs to keep
> him from engaging in [self-injurious behaviors
> ("SIBs")] by attending to his subtle cues to
> redirect him before he engages in SIBs.

[Id. at 276-77 (dkt. no. 13-4 at PageID.835-86).]  The 3/18/21
IEP provided that J.M. would receive extended school year
("ESY") services after a ten-day break.  Those services would
consist of 1200 minutes of special education and 45 minutes of
counseling services per week, as well as all supplementary aids
and services that would be provided during the school year.
[Id. at 276 (dkt. no. 13-4 at PageID.835).]  The 3/18/21 IEP
noted that J.M. was "pursuing a certificate program," [id. at
259 (dkt. no. 13-4 at PageID.818),] and that his "course of
study [at the Private Center] include[d] instruction in
vocational skills, independent living skills and functional
academic skills."  [Id. at 265 (dkt. no. 13-4 at PageID.824).]

      The 3/30/21 PWN stated the DOE proposed to begin the
services specified in the 3/18/21 IEP within ten days at the
Home School.  [Petitioners' Exh. 1.23, AR at 282 (dkt. no. 13-5
at PageID.842).]  The IEP team considered and rejected the
following:

Request to delay the completion of the annual IEP meeting to gather more information convene Re-Evaluation/Triennial Meeting to request assessments and assessment data.

Adding [a registered behavior technician ("RBT")] to [J.M.'s] supplementary aids and services

Requesting [a functional behavior assessment ("FBA")] during the writing of the Annual IEP

Increasing the duration of counseling services

Using the [Private] Center suggested goals and objectives as provided

[Least restrictive environment ("LRE")] placement in the general education setting all day

LRE placement in a combination of the general education and special education setting

LRE placement in the special education setting all day

LRE placement in the private separate facility

LRE placement in the private residential facility

LRE placement in the homebound/home hospital

[Id. at 284 (dkt. no. 13-5 at PageID.844).]  As to J.M.'s

placement, the 3/30/21 PWN stated:

The IEP Team rejected LRE placement in the public separate facility because [J.M.] does not have access to his access to his general education peers.  Additionally, this setting would not offer as much access to extracurricular activities and other events which occur on a high school campus.

The DOE Team rejected LRE placement in the private separate facility because [J.M.] does not have access to his nondisabled peers.  There is no requirement that the staff is certificated as

8

> a teacher.  There is no evidence of standards
> based curriculum for academics or social
> emotional learning.  He would be unable to earn a
> high school diploma.  [Mother] and the [Private]
> Center accepted this LRE placement because they
> stated that it has met [J.M.'s] needs for several
> years and that the transition to a DOE school
> will be challenging.

[Id.]

Mother submitted a Request for IDEA Impartial Due Process Hearing to the DOE on April 12, 2021 ("Due Process Complaint"), a First Amended Request for IDEA Impartial Due Process Hearing on April 23, 2021 ("Amended Due Process Complaint"), and a Second Amended Request for IDEA Impartial Due Process Hearing ("Second Amended Due Process Complaint") on June 16, 2021.  See Decision, AR at 534-36 (dkt. no. 12-53 at PageID.636-38); see also Due Process Complaint, AR at 1-2 (dkt. no. 12-1 at PageID.51-52); Amended Due Process Complaint, AR at 20-26 (dkt. no. 12-6 at PageID.75-81); Second Amended Due Process Complaint, AR at 250-57 (dkt. no. 12-24 at PageID.323-30).

On May 7, 2021, Mother filed a Motion to Enforce Stay Put and for Reimbursement ("Stay-Put Motion").  [Stay-Put Motion, AR at 29-43 (dkt. no. 12-8 at PageID.86-100).]  After a May 21, 2021 hearing, the Hearings Officer denied the motion in a June 2, 2021 order ("Stay-Put Order").  [Stay-Put Order, AR at 209-23 (dkt. no. 12-16 at PageID.274-88).]  The Hearings Officer

ruled that Respondents were not required to pay for J.M. to attend the Private Center while the proceedings were pending because J.M.'s "'then-current educational placement' is the IEP-11/14/14."[9] [Id. at 222 (dkt. no. 12-16 a PageID.287).]

The due process hearing was held on September 9, 10, 13, 17, 20, 28, and 30, 2021. [Decision, AR at 537 (dkt. no. 12-53 at PageID.639).]

The Decision identified the issues before the Hearings Officer as follows:

1.   Whether Respondents denied Student a free appropriate public education (hereinafter "FAPE") when the Individualized Education Program (hereinafter "IEP") team predetermined Student's placement.

2.   Whether Respondents denied Student a FAPE when the IEP team ignored the recommendations of Student's treating psychologist, the functional behavior assessment, and other evaluation data.

3.   Whether Respondents denied Student a FAPE when the IEP team determined Student's placement without having Student's triennial evaluations in place.

4.   Whether Respondents denied Student a FAPE because the change from "Individual Instructional Support" to "Close Adult Supervision" is a reduction in services that is detrimental to Student's health and

---

[9] Although the Hearings Officer referred to the document as the "IEP-11/14/14," it was prepared by Respondents on November 24, 2014. See Stay-Put Order, AR at 211 (dkt. no. 12-16 at PageID.276). Thus, it is the same as the "11/24/14 IEP" discussed in 224 F. Supp. 3d 1071.

safety and to Student's ability to receive a
meaningful educational benefit.

5.    Whether Respondents denied Student a FAPE
because Student's placement in the 2021 IEP
is not the appropriate least restrictive
environment for Student.

6.    Whether Respondents denied Student a FAPE by
failing to provide an appropriate transition
plan for Student to transition into
Student's new placement.

7.    Whether Respondents denied Student a FAPE by
significantly infringing upon [Mother]'s
ability to participate in the development of
Student's IEP.

8.    Whether Respondents denied Student a FAPE
when the program in which Student was placed
through the 2021 IEP was closed for the
summer and Student would not have been
provided the extended school year services
as required by the 2021 IEP.

9.    Whether Respondents failed to provide
Petitioners with an appropriate prior
written notice that complies with 34 C.F.R.
§ 300.503 by failing to provide a proper
description of the action and explanation to
[Mother].

[Id. at 541-42 (dkt. no. 12-53 at PageID.643-44).]

The Hearings Officer ruled as follows: as to the first
issue, J.M.'s placement and services were not predetermined by
the DOE because the DOE's implementation of a policy that a RBT
is only provided after an FBA and a behavioral intervention plan
("BIP") did not constitute improper predetermination under the
circumstances of this case.  Further, J.M.'s placement at the
Home School was made after the team's full consideration of

J.M.'s needs and the different possible placements available. [Id. at 606-11 (dkt. no. 12-53 at PageID.708-13).]

As to the second issue, Mother failed to prove that J.M. was denied a FAPE due to the IEP team's alleged failure to consider the recommendations of J.M.'s treating psychologist ("Treating Psychologist"),[10] the FBA prepared for the Private Center, and other data available to the team.  The team considered Treating Psychologist's concerns and addressed some of them in the IEP, but the team had sound reasons for disregarding Treating Psychologist's recommendation that J.M. remain at the Private Center.  The IEP team considered Private BCBA1's[11] FBA and the Private Center's behavioral support plan ("BSP") and crisis plan and included the need for a BSP and a crisis plan in the IEP.  Although the IEP does not include individualized instruction support ("IIS") services, it includes CAS services, and adding IIS services was a possibility after the DOE prepared its own FBA and BSP.  Further, Mother failed to prove that the IEP team failed to consider the data available to it.  [Id. at 611-16 (dkt. no. 12-53 at PageID.713-18).]

---

[10] "Treating Psychologist" refers to Santo Triolo, Ph.D. [Decision Legend, AR at 532 (dkt. no. 12-53 at PageID.634).]

[11] "Private BCBA1" refers to Amanda Simone.  [Decision Legend, AR at 533 (dkt. no. 12-53 at PageID.635).]  A "BCBA" is a Board-Certified Behavior Analyst.

As to the third issue, Mother failed to prove that J.M. was denied a FAPE because the IEP team declined to wait until after J.M.'s triennial evaluation to complete his IEP. Although the last team meeting was March 18, 2021, and the triennial reevaluation due date was April 11, 2021, the IEP team first met regarding this IEP in October 2020, and the DOE attempted to schedule the first meeting earlier, but the DOE ultimately scheduled it in October to accommodate Mother's schedule.  Although Mother hoped to have the DOE conduct an FBA and develop a BSP or BIP before the development of the IEP, which would have made the inclusion of IIS services possible, under the circumstances of this case, it is unlikely that IIS services would have been added even if an FBA had been done before the IEP was developed.  [Id. at 616-618 (dkt. no. 12-53 at PageID.718-20).]

As to the fourth issue, Mother failed to prove that the inclusion of CAS services instead of IIS services constituted a reduction in services that was detrimental to J.M.'s health and safety and impaired his ability to receive meaningful educational benefits.  The services that Private RBT1[12] was providing to J.M. at the Private Center were not as extensive as the services that an IIS would provide, and the

---

[12] "Private RBT1" refers to Kristen Haddon.  [Decision Legend, AR at 532 (dkt. no. 12-53 at PageID.634).]

specific duties of the CAS services included in the 3/18/21 IEP included similar services.  [Id. at 618-20 (dkt. no. 12-53 at PageID.720-22).]

As to the fifth issue, the Home School program in the 3/18/21 IEP was the appropriate LRE.  Mother did not establish that J.M. would be immediately subject to bullying if he returned to a public school.  Treating Psychologist's opinion that it was too late for J.M. to move schools was not sufficiently supported and was refuted by DOE professionals. Further, having J.M. transition to a public school would help him learn adjustment skills that he will need when he transitions out of the school system.  [Id. at 620-25 (dkt. no. 12-53 at PageID.722-27).]

As to the sixth issue, Mother did not prove that the post-secondary transition plan in the 3/18/21 IEP was insufficient, nor did she prove that J.M. was denied a FAPE because of the failure to create a plan to transition J.M. from the Private Center to Home School.  The DOE attempted to schedule a transition meeting at the end of the March 18, 2021 IEP meeting, and offered to arrange visits.  However, Mother later stopped communicating with Home School, and thus refused to participate in the creation of the transition plan.  [Id. at 625-27 (dkt. no. 12-53 at PageID.727-29).]

14

As to the seventh issue, Mother did not establish that there was a significant infringement upon her ability to participate in the formulation of J.M.'s IEP.  Mother and the Private Center personnel advocating on Mother and J.M.'s behalf were fully informed about the proposed placement and services, and they had ample opportunity to present their positions. Although there were ultimately disagreements on the contents of the 3/18/21 IEP, Mother was not denied the opportunity to participate in the development of J.M.'s IEP.  [Id. at 627-28 (dkt. no. 12-53 at PageID.729-30).]

As to the eighth issue, Mother did not prove that J.M. was denied a FAPE because the Dream School program at the Home School was closed during the summer, and thus could not provide J.M. with the ESY services he requires.[13]  Under the 3/18/21 IEP, a special education setting at the Home School was J.M.'s placement.  The Dream School program was not the placement, and therefore the fact that the program was closed during the summer did not result in a denial of FAPE.  [Id. at 629-30 (dkt. no. 12-53 at PageID.731-32).]

As to the ninth issue, Mother did not prove that the 3/30/21 PWN provided an inadequate description and explanation

---

[13] [13] The name "Dream School" is not used in the Decision, but it is used in the parties' briefs.  See, e.g., Opening Brief at 4.

of the proposed action.  It specified that the placement was a
special education setting in the Home School, and it was not
necessary for the notice to specify a specific special education
classroom or program that J.M. would participate in.  Further,
Mother and J.M. were offered to visit the Home School, and they
were told that a transition plan would be developed.  [Id. at
630-32 (dkt. no. 12-53 at PageID.732-34).]

        Ultimately, the Hearings Officer concluded that Mother
failed to prove that J.M. was denied a FAPE.  Thus, the request
for the development of a new IEP that provided for placement at
the Private Center and the request for tuition reimbursement
were denied.  [Id. at 632-33 (dkt. no. 12-53 at PageID.734-35).]

        In the instant Appeal, Plaintiff argues the Hearings
Officer erred in denying the Stay-Put Motion and in concluding
that J.M. was offered a FAPE.  Plaintiff contends the 3/18/21
IEP did not offer J.M. a FAPE because: the DOE engaged in
improper predetermination of J.M.'s services; the DOE members of
the IEP team failed to consider evidence presented to the team;
the IEP team should not have created J.M.'s IEP until after the
completion of his triennial evaluation; Mother was not given an
adequate opportunity to participate in the development of the
3/18/21 IEP; the CAS services provided for in the 3/18/21 IEP
were insufficient to meet J.M.'s needs; the placement provided
for in the 3/18/21 IEP was not the least restrictive environment

16

necessary for J.M. and the placement was inappropriate because the Dream School could not provide the ESY services called for in J.M.'s IEP; the IEP did not include a transition plan for J.M.'s transition from the Private Center to the Home School;[14] and the 3/20/21 PWN was inadequate.

**STANDARD**

I.  **General IDEA Standards**

> The IDEA's "primary goal is 'to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services . . . .'" J.L. v. Mercer Island Sch. Dist., 592 F.3d 938, 947 (9th Cir. 2010) (quoting 20 U.S.C. § 1400(d)(1)(A)). A FAPE must be "tailored to the unique needs of the handicapped child by means of an 'individualized educational program' (IEP)." Hendrick Hudson Cent. Sch. Dist. Bd. of Educ. v. Rowley, 458 U.S. 176, 181, 102 S. Ct. 3034, 73 L. Ed. 2d 690 (1982) (quoting 20 U.S.C. § 1401(18)). An IEP must contain, among other things, "a statement of the child's present levels of academic achievement," "a statement of measurable annual goals" and "a statement of the special education and related services . . . to be provided to the child." 20 U.S.C. § 1414(d)(1)(A)(i). When formulating an IEP, a school district "must comply both procedurally and substantively with the IDEA," M.L. v. Fed. Way Sch. Dist., 394 F.3d 634, 644 (9th Cir. 2005) (citing Rowley, 458 U.S. at 206–07, 102 S. Ct. 3034), so that the process "will

---

[14] The Hearings Officer discussed post-high school transition planning in the discussion of the transition plan argument. See Decision, AR at 625-27 (dkt. no. 12-53 at PageID.727-29). However, this Court does not construe Plaintiff's transition plan argument in the Appeal as addressing the adequacy of the post-high school transition plan in the 3/18/21 IEP. See Petitioners' Exh. 1.22 (3/18/21 IEP), AR at 265-66 (dkt. no. 13-4 at PageID.824-25, Opening Brief at 27-29.

be informed not only by the expertise of school officials, but also by the input of the child's parents or guardians," <u>Endrew F. v. Douglas Cty. Sch. Dist.</u>, 580 U.S. ----, ----, 137 S. Ct. 988, 197 L. Ed. 2d 335 (2017).

<u>M.C. ex rel. M.N. v. Antelope Valley Union High Sch. Dist.</u>, 858 F.3d 1189, 1194 (9th Cir. 2017) (alterations in <u>M.C.</u>).

This Court reviews the Hearings Officer's ruling that the DOE offered J.M. a FAPE de novo.  <u>See</u> <u>id.</u>; <u>see also</u> <u>Dep't of Educ. v. Acen T. ex rel. Wayne T.</u>, Civil No. 19-00259 HG-KJM, 2020 WL 1673674, at *4 (D. Hawai`i Apr. 6, 2020) (noting "the ultimate determination of an IEP's appropriateness is reviewed de novo" (citing <u>Capistrano Unified Sch. Dist. v. Wartenberg</u>, 59 F.3d 884, 891 (9th Cir. 1995), *aff'd after remand on other issues*, 462 Fed. Appx. 745 (2011))).

This Court "can accord some deference to the [Hearings Officer]'s factual findings, but only where they are thorough and careful, and the extent of deference to be given is within [this Court's] discretion."  <u>See</u> <u>M.C.</u>, 858 F.3d at 1194 (citation and internal quotation marks omitted).  The length of the hearing and the length of the decision alone do not render the findings thorough and careful.  <u>Id.</u> at 1194-95 (holding the factual findings were not thorough and careful, although the hearings officer wrote a twenty-one-page decision after a three-day hearing, because the hearings officer did not address all of the issues and disregarded some of the evidence).

18

"It is firmly established that '[t]he burden of proof in an administrative hearing challenging an IEP is properly placed upon the party seeking relief.'" J.G. ex rel. Greenberg v. Hawaii, Dep't of Educ., CIV. NO. 17-00503 DKW-KSC, 2018 WL 3744015, at *6 (D. Hawai`i Aug. 7, 2018) (alteration in J.G.) (quoting Schaffer v. Weast, 546 U.S. 49, 62 (2005)), aff'd, 772 F. App'x 567 (9th Cir. 2019).

## II.   **Stay-Put**

20 U.S.C. §1415(j) states:

Except as provided in subsection (k)(4), during the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child, or, if applying for initial admission to a public school, shall, with the consent of the parents, be placed in the public school program until all such proceedings have been completed.

See also Haw. Admin. R. §8-60-72(a).

## III.  **FAPE Standards**

To determine whether a student has been offered a FAPE, the Supreme Court of the United States has established a two-part test, which examines: (1) whether the state has complied with the procedural requirements set forth in the IDEA; and (2) whether the IEP developed through the Act's procedures is reasonably calculated to enable the child to receive educational benefits. Bd. of Educ. v. Rowley, 458 U.S. 176, 206-07 (1982). "Procedural flaws in the IEP process do not always amount to the denial of a FAPE." L.M. [v. Capistrano Unified Sch. Dist.], 556 F.3d [900,] 909 [(9th Cir. 2009)] (citations omitted). Rather, "[a] procedural violation denies a free

> appropriate public education if it results in the
> loss of an educational opportunity, seriously
> infringes the parents' opportunity to participate
> in the IEP formulation process or causes a
> deprivation of educational benefits." J.L. v.
> Mercer Island Sch. Dist., 592 F.3d 938, 952 (9th
> Cir. 2009) (citing N.B. v. Hellgate Elementary
> Sch. Dist., 541 F.3d 1202, 1208 (9th Cir. 2008)).
> Additionally, the "educational benefit[]" that
> the child's IEP "is reasonably calculated to
> enable the child to receive" must be more than *de
> minimus*. Endrew F. v. Douglas County School
> District, 137 S. Ct. 988 (2017).  The IDEA
> "requires an educational program reasonably
> calculated to enable a child to make progress
> appropriate in light of the child's
> circumstances." Id. at 1001; Blake C. ex rel.
> Tina F. v. Haw. Dep't of Educ., 593 F. Supp. 2d
> 1199, 1206 (D. Haw. 2009) (holding that the IEP
> must be tailored to the unique needs of the child
> and reasonably designed to produce benefits that
> are "significantly more than de minimus, and
> gauged in relation to the potential of the child
> at issue").

J.G., 2018 WL 3744015, at *5 (some alterations in J.G.).

    The Supreme Court has previously stated that an
"appropriate" education does "not mean a potential-maximizing
education." Rowley, 458 U.S. at 197 n.21.  However, the Supreme
Court clarified Rowley in Endrew F.  See M.C., 858 F.3d at 1201
(stating that, under Endrew F., "the school must implement an
IEP that is reasonably calculated to remediate and, if
appropriate, accommodate the child's disabilities so that the
child can 'make progress in the general education curriculum,'
id. at ----, 137 S. Ct. 988 (citation omitted), taking into
account the progress of his non-disabled peers, and the child's

potential"). The Supreme Court emphasized that "[a] review of an IEP must appreciate that the question is whether the IEP is **reasonable,** not whether the court regards it as ideal." Endrew F., 137 S. Ct. at 999 (emphasis in Endrew F.) (citing Rowley, 458 U.S. at 206-207, 102 S. Ct. 3034).

## DISCUSSION

### I.   Stay-Put

Plaintiff argues that, when the Due Process Complaint was filed, the Private Center was the placement called for in J.M.'s last implemented IEP, and it was the placement specified in the Settlement Agreement. J.M.'s 11/24/14 IEP offered him a FAPE at the DOE school that was his home school at that time, but J.M. was entitled to stay-put relief during all administrative and judicial proceedings challenging the 11/24/14 IEP. See *supra* discussion of J.M., 224 F. Supp. 3d 1071. Those proceedings ended on January 14, 2019, when the United States Supreme Court denied J.M.'s petition for a writ of certiorari. See J.M., 139 S. Ct. 923. Thus, because J.M. was only allowed to remain at the Private Center while his stay-put relief was in effect, his educational placement was the DOE home school.

Although the Settlement Agreement provided that the DOE would pay J.M.'s tuition at the Private Center from May 1, 2019 to October 31, 2020, see Settlement Agreement, AR at 143 (dkt. no. 12-11 at PageID.203), the agreement also stated:

21

It is also understood and agreed that the DOE's agreement to do certain things as agreed to under this Agreement and Petitioners' agreement to accept and settle this dispute are not the admissions on the part of Petitioners or DOE or their employees, officers, or agents, but compromises and settles all the disputes raised in the Request for the purpose of avoiding further controversy, litigation and expense, and that consideration herein stated are final considerations for this Agreement and no other consideration has been promised[.]

[Id. at 142 (dkt. no. 12-11 at PageID.202).]  Mother agreed to withdraw, with prejudice, the due process complaint that was pending at that time.  [Id. at 143 (dkt. no. 12-11 at PageID.203).]  There is no provision in the Settlement Agreement recognizing the Private Center as J.M.'s placement.

In the Stay-Put Order, the Hearings Officer noted that, in August 2020, Respondents attempted to schedule an IEP team meeting to develop an IEP before the reimbursement period specified in the Settlement Agreement expired, but Mother was unavailable in August and proposed dates in October.  The team met in October but did not complete the IEP until March 18, 2021.  [Stay-Put Order, AR at 213 (dkt. no. 12-16 at PageID.278).]  The 3/18/21 IEP projected that services would begin on April 8, 2021.  [Petitioners' Exh. 1.22 (3/18/21 IEP), AR at 276 (dkt. no. 13-4 at PageID.835).]  The DOE continued to pay for J.M.'s program at the Private Center until the date that the 3/18/21 IEP projected as the start date for services.

[Transcript of Proceedings Volume I (taken 9/9/21), filed under seal 1/11/22 (dkt. no. 17), at 52-54 (dkt. no. 17 at PageID.2399-401); id. at 72 (dkt. no. 17-1 at PageID.2419).]

The 4/8/19 PWN and the 3/29/19 IEP called for J.M. to receive services at the Home School.  See Petitioners' Exh. 1.3 (4/8/19 PWN and 3/29/19 IEP), AR at 38-39 (dkt. no. 13-1 at PageID.747-48) (explaining why placement at the Private Center was rejected); AR at 40 (dkt. no. 13-1 at PageID.749).  Thus, well before the 3/18/21 IEP, Petitioners had notice that the DOE was proposing to have J.M. leave the Private Center and attend the Home School.  Thus, under the circumstances of this case, the Hearings Officer did not err in concluding that J.M.'s continued enrollment at the Private Center after the DOE stopped paying for his program was a unilateral placement.  See Sam K. ex rel. Diane C. v. Haw. Dep't of Educ., 788 F.3d 1033, 1039 (9th Cir. 2015) (distinguishing between K.D. ex rel. C.L. v. Dep't of Educ., Hawai`i, 665 F.3d 1119-20, 1122 (9th Cir. 2011), where the Ninth Circuit affirmed the ruling that the placement was unilateral, and Sam K., in which it held that the placement was not unilateral).

Petitioners' Appeal is denied as to the challenge to the Stay-Put Order, and the Stay-Put Order is affirmed.

II. **Whether the 3/18/21 IEP Offered J.M. a FAPE**

    A. **Placement**

        Plaintiff argues J.M. was not offered a FAPE because the placement provided for in the 3/18/21 IEP and the 3/30/21 PWN was not the least restrictive environment necessary for J.M., and because the Dream School could not provide the ESY services called for in J.M.'s IEP.

        1. **ESY**

        Plaintiff's argument regarding the Dream School's inability to provide J.M.'s ESY services assumes that the Dream School was J.M.'s proposed placement. It was not.

        Under the IDEA, "the term 'placement' means the 'general educational program of the student.'" Rachel H. v. Dep't of Educ. Haw., 868 F.3d 1085, 1091 (9th Cir. 2017) (quoting N.D. ex rel. Parents Acting As Guardians Ad Litem v. Haw. Dep't of Educ., 600 F.3d 1104, 1116 (9th Cir. 2010)). In contrast, the term "location" has a narrower meaning, and it "concerns the environment in which a particular special education service will be provided." Id. (citing Assistance to States for the Education of Children with Disabilities, 64 Fed. Reg. 12,406, 12,594 (Mar. 12, 1999)). "For example, the educational placement of a student might be regular classes with a one-on-one aide and modified testing. Conversely, the location of a special education service, such as modified

24

testing, might be in a teacher's office." Id. (citing 34 C.F.R. § 300.115(b)(1)).

The 3/30/21 PWN states the IEP team "determined that the special education setting would be the most appropriate placement at this time." [Petitioners' Exh. 1.23, AR at 283 (dkt. no. 13-5 at PageID.843).] It also states J.M.'s FAPE would be provided at the Home School, and he "will participate with non-disabled peers at meal times and recess, school assemblies, special events, and appropriate electives and work-related activities. He will not participate with non-disabled peers for all other school subjects." [Id., AR at 282 (dkt. no. 13-5 at PageID.842).] While the Dream School was proposed as one of the locations where J.M. would receive some of his services, it was not his placement. His placement was a special education setting at the Home School, with appropriate services and supports. Although the Dream School was not open during the summer, it is undisputed that the Home School offered ESY services. See, e.g., Petitioners' Exh. 4.38, AR at 580-81 (dkt. no. 15-22 at PageID.1073-74) (email dated 6/8/21 from SPED Teacher 2 to Mother and others, addressing Mother's email 6/7/21 requesting a visit to the Dream School). Because a special education setting at the Home School was J.M.'s placement, the fact that J.M. could not receive ESY services at the Dream School did not result in the denial of a FAPE.

2.   **LRE**

This district court has stated:

> The IDEA requires each state to establish procedures to assure that:
>
> > [t]o the maximum extent appropriate, children with disabilities . . . are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.
>
> 20 U.S.C. § 1412(a)(5)(A).  This LRE provision "sets forth Congress's preference for educating children with disabilities in regular classrooms with their peers." Sacramento City Unified Sch. Dist., Bd. of Educ. v. Rachel H., 14 F.3d 1398, 1403 (9th Cir. 1994) (citations omitted).  School districts must ensure that a "continuum of alternative placements is available to meet the needs of children with disabilities," including "instruction in regular classes, special classes, special schools, home instruction, and instruction in hospitals and institutions." 34 C.F.R. § 300.115(a), (b)(1).
>
> In order to analyze whether a school district provided a child with a FAPE by placing the child in his or her LRE, courts in the Ninth Circuit employ a four-factor balancing test, which considers "(1) the educational benefits of placement full-time in a regular class; (2) the non-academic benefits of such placement; (3) the effect [that the disabled child] had on the teacher and children in the regular class; and (4) the costs of mainstreaming [the child]." Rachel H., 14 F.3d at 1404.

<u>Clarfeld v. Dep't of Educ.</u>, CIVIL NO. 20-00234 JAO-KJM, 2021 WL
144222, at *15 (D. Hawai`i Jan. 15, 2021) (alterations in
<u>Clarfeld</u>), *aff'd*, No. 21-15226, 2022 WL 822118 (9th Cir.
Mar. 17, 2022), *cert. denied*, 143 S. Ct. 171 (2022).

      The IEP team considered a full range of placements,
from placement in a general education setting for eighty percent
or more of the school day to placement in a private residential
facility or home hospital placement.  <u>See</u> 3/30/21 PWN, AR at
284-85 (dkt. no. 13-5 at PageID.844-45).  Less restrictive
placements - *i.e.*, those that involved a general education
setting for at least part of the school day - were rejected
because J.M. experiences increased anxiety with more challenging
demands and pacing, and his difficulty managing his anxiety
leads to increased frustration, resulting in inappropriate
behaviors.  <u>See</u> <u>id.</u> at 284 (dkt. no. 13-5 at PageID.844).  More
restrictive placements were rejected because J.M. would not have
any access to non-disabled peers in the educational setting.
<u>See</u> <u>id.</u> at 284-85 (dkt. no. 13-5 at PageID.844-45).  The 3/30/21
PWN states:

> 5.   IEP team utilized the Rachel H factors and
> discussed the educational benefits, the non
> academic benefits and the impact the student
> would have on the teacher and other students for
> all settings in the LRE continuum.  The team
> determined that the special education setting
> would be the most appropriate placement at this
> time.  In the special education setting, [J.M.'s]
> program would be tailored to his specific needs,

a variety of resources would be available,
appropriate staffing, training, and available
supports would be available to address his
specific needs, and he would have access to
general education peers on a DOE campus.  The
setting allows [J.M.] to prepare for a diploma if
he chooses, offers him access to community based
instruction, and an opportunity to work with same
age peers.  He would have a limited behavioral
impact in this small classroom and highly
structured setting with a variety of
interventions in place.

6.   After a lengthy conversation and much
discussion of the students needs and supports,
the offer above was made by the administrator.
[J.M.'s] IEP goals and objectives can be
accomplished at his home school and in the
special education setting.  Additionally, this
setting best allows for [J.M.'s] academic growth
and development while his behavioral needs will
be attended to by well trained, certificated
professionals.  [J.M.] will have access to his
general education peers, extracurricular
activities, and workplace readiness
opportunities.  He will receive the instruction
and support necessary to earn a high school
diploma, if he chooses.

[Id. at 283 (dkt. no. 13-5 at PageID.843).]

Thus, the IEP team considered all of the relevant

factors, and the restrictions associated with the placement that

was ultimately included in the 3/18/21 IEP and the 3/30/21 PWN

were necessary under the circumstances.  Plaintiff has not

established that J.M.'s IEP team failed to place him in his LRE.

### 3.   Ruling on Plaintiff's Placement Arguments

This Court therefore rejects Plaintiff's arguments

regarding the placement specified in J.M.'s 3/18/21 IEP and the

28

3/30/21 PWN.  The Hearings Officer's Decision is affirmed as to the placement issues.

**B.   <u>Predetermination</u>**

In September 2019, the DOE changed its policy about the inclusion of IIS services in IEPs.  <u>See</u> Respondents' Exh. 170, AR at DOE 1059-60 (dkt. no. 16-80 at PageID.1826-27) (memorandum dated 9/6/19 to "Deputy Superintendent, Complex Area Superintendents, Principals (All), District Educational Specialists, Student Services Coordinators, Special Education Teachers, School-Based Behavioral Health, Autism Personnel, and Public Charter School Directors (All)" from State of Hawai`i Department of  Education Superintendent, Dr. Christina M. Kishimoto ("9/6/19 IIS Memo")).  The 9/6/19 IIS Memo stated:

> The IIS should only be provided when a student is in need of full-time uniquely designed behavior interventions to access academic and nonacademic activities during the school day.  The provision of IIS must be outlined in the student's Behavior Intervention Plan (BIP), indicated on his/her IEP and provided by a qualified staff member under direct supervision of a qualified Applied Behavior Analysis (ABA) professional.
>
> To accurately determine the need for IIS, a Functional Behavior Assessment (FBA) must be conducted.  It is only when the results of the FBA indicate the need for an intensive behavioral program, in the form of a BIP and delivered by a dedicated individual, should IIS be considered by the IEP team.
>
> In the past, the IIS was used for non-behavioral needs.  However, moving forward the IIS will only be used to address intensive behavioral needs.

> Therefore, in cases where the IIS is currently
> used for non-behavioral needs such as personal or
> self-care, the IEP team must reconvene to
> carefully review the level and type of support
> that the student requires.

[Id. at DOE 1059 (dkt. no. 16-80 at PageID.1826).] Plaintiff

argues the implementation of the 9/6/19 IIS Memo in the

formulation of J.M.'s 3/18/21 IEP resulted in the predetermined

denial of one-to-one support services, which J.M. needs. See

Opening Brief at 10-11.

> The Ninth Circuit has held that:
>
> > A school district violates the IDEA if it
> > predetermines placement for a student before the
> > IEP is developed or steers the IEP to the
> > predetermined placement. W.G. v. Bd. of Tr. of
> > Target Range Sch. Dist. No. 23, 960 F.2d 1479,
> > 1484 (9th Cir. 1992), *superseded by statute on
> > other grounds, as recognized in* R.B. v. Napa
> > Valley Unified Sch. Dist., 496 F.3d 932 (9th Cir.
> > 2007); see also Spielberg v. Henrico Cnty. Pub.
> > Schs., 853 F.2d 256, 258-59 (4th Cir. 1988).
> > Predetermination violates the IDEA because the
> > Act requires that the placement be based on the
> > IEP, and not vice versa. Spielberg, 853 F.2d at
> > 259.

K.D., 665 F.3d at 1123. An example of a predetermined placement

is when the parents are presented with "a 'take it or leave it'

option." R.A. ex rel. Habash v. W. Contra Costa Unified Sch.

Dist., 696 F. App'x 171, 173 (9th Cir. 2017) (citing JG v.

Douglas Cty. Sch. Dist., 552 F.3d 786, 801 n.10 (9th Cir.

2008)). If the evidence shows that the school district was

open-minded in the placement decision and other decisions in the

IEP development process, the placement was not predetermined. See S.H. ex rel. Hollister v. Tustin Unified Sch. Dist., 682 F. App'x 559, 561 (9th Cir. 2017).

The policy change described in the 9/6/19 IIS Memo was a system-wide policy change established more than a year before J.M.'s 3/18/21 IEP was developed.  Further, the IEP team considered, but rejected, the possibility of delaying the completion of J.M.'s IEP to conduct further assessments, including requesting an FBA, which could have allowed the IEP team to include IIS services in J.M.'s IEP.  See Petitioners' Exh. 1.23 (3/30/21 PWN), AR at 284 (dkt. no. 13-5 at PageID.844) (listing, among the "other options considered," the "[r]equest to delay the completion of the annual IEP meeting to gather more information convene Re-Evaluation/Triennial Meeting to request assessments and assessment data" and"[r]equesting an FBA during the writing of the Annual IEP").  The request to delay the completion of J.M.'s IEP so that it could be developed in conjunction with his triennial reevaluation meeting was rejected

> because the Annual IEP was drafted based on current data made available by the [Private] Center.  Additionally, the drafting of the IEP took several two-hour meetings and 5 months to complete.  To abort the completion of the IEP and begin a new process was inappropriate.  At the completion of the IEP meeting the IEP team started a reeval meeting and requested these assessments opening a new timeline.

[Id.]

> The IEP team rejected requesting an FBA during
> the writing of the Annual IEP because the IEP was
> written based upon current data and a
> ReEvaluation [sic] meeting was due in April and
> and [sic] FBA could be requested at that time if
> the team determined the need.  The [Private
> Center] conducted their own FBA which may be
> considered when determining [J.M.'s] behavioral
> needs[.]

[Id.]

In addition, the IEP team addressed the needs that Plaintiff argues required IIS by including CAS among his services and supports.  See Petitioners' Exh. 1.23 (3/30/21 PWN), AR at 283 (dkt. no. 13-5 at PageID.843) (stating J.M. will be provided with "[c]lose adult supervision to assist with the implementation of services and supports").  The description of the CAS described in the 3/18/21 IEP, see supra Background Section, is similar to the support that Private RBT1 was providing J.M. at the Private Center.  See Transcript Volume II (Administrative Hearing, held 9/10/21) ("Trans. II"), filed under seal 1/11/22 (dkt. no. 18), at 272 (dkt. no. 18-1 at PageID.2621) (RBT1 testified that, if she saw J.M. exhibit body cues that previously indicated he was having intrusive thoughts, she would ask him about it); id. at 274 (dkt. no. 18-1 at PageID.2623) (RBT1 gave an example of a type of intrusive thought J.M. experienced, "if it's something that's frustrating him or challenging for him and he's feeling to a point where he

may have a meltdown, I'll make sure that, you know, I take a moment and ask if he needs a break").[15]

Further, as noted by the Hearings Officer, during the meetings which culminated in the formulation of the 3/18/21 IEP, J.M.'s Treating Psychologist suggested that J.M. be encouraged to talk to someone about his thoughts and things that bother him so that it did not escalate. [Decision, AR at 576 (dkt. no. 12-53 at PageID.678) (citing P-Ex. 7.3 [59:51-1:01:56]).] The 3/18/21 IEP includes 945 minutes of counseling per quarter during the school year, and 45 minutes per week during the extended school year. [Petitioners' Exh. 1.22 (3/18/21 IEP), AR at 276 (dkt. no. 13-4 at PageID.835).] The IEP team considered including more minutes of counseling services, but the team rejected that option because it concluded that the minutes in the 3/18/21 IEP were adequate for J.M.'s needs.

The IEP team's consideration of J.M.'s needs and inclusion of CAS services and counseling services in the 3/18/21 IEP shows that the team did not engage in predetermination of J.M.'s services. The Hearings Officer did not err in concluding

---

[15] Private RBT1 testified that she provides one-on-one support for J.M., but she acknowledged that she also acts as his tutor or teacher. See Trans. II at 267-69 (dkt. no. 18-1 at PageID.2616-18). The tutoring/teaching services she provides are not relevant to the issues in the instant Appeal.

that Plaintiff failed to prove that J.M. was denied a FAPE
because of improper predetermination.

### C. <u>Failure to Consider Evidence/Parental Participation</u>

Plaintiff argues J.M. was denied a FAPE because the
DOE members of the IEP team failed to consider evidence
presented by Mother, J.M.'s Treating Psychologist, and persons
who worked with J.M. at the Private Center.  Further, this
failure to consider evidence deprived Mother of the opportunity
to participate in the formulation of the J.M.'s IEP.[16]

"[A]lthough the formulation of an IEP is ideally to be
achieved by consensus among the interested parties at a properly
conducted IEP meeting, sometimes such agreement will not be
possible."  <u>Doe by Gonzales v. Maher</u>, 793 F.2d 1470, 1490 (9th
Cir. 1986),[17] *aff'd as modified sub nom.* <u>Honig v. Doe</u>, 484 U.S.
305 (1988).[18]  This district court has stated:

---

[16] Plaintiff also argues Mother was denied the opportunity
to participate in the development of the transition plan.  That
argument will be addressed *infra* Discussion Section II.C.1.

[17] <u>Doe v. Maher</u> addressed the Education for All Handicapped
Children Act ("EAHCA").  <u>See, e.g.</u>, 793 F.2d at 1476.  This
district court has noted that, "[i]n 1990, the EAHCA was amended
to change the title of the act to the IDEA.  Although a number
of amendments have been made to the IDEA, many of the
substantive goals of the EAHCA remain in today's IDEA."  <u>B.B. ex
rel. J.B. v. Hawai`i, Dep't of Educ.</u>, 483 F. Supp. 2d 1042, 1050
(D. Hawai`i 2006) (citation omitted).

[18] The Supreme Court's modifications to the Ninth Circuit's
<u>Doe</u> opinion do not affect the portions cited in this Order.

> The IDEA does not explicitly vest within
> parents a power to veto any proposal or
> determination made by the school district or IEP
> team regarding a change in the student's
> placement. [Doe v. Maher, 793 F.2d] at 1489.
> Rather, the IDEA requires that parents be
> afforded an opportunity to participate in the IEP
> process and requires the IEP team to consider
> parental suggestions. See e.g., McGovern v.
> Howard County Pub. Sch., No. AMD 01-527, 2001
> U.S. Dist. LEXIS 13910 at *55-56 (D. Md. Sept. 6,
> 2001). The McGovern court held that when a
> parent's suggestions pertaining to a child's
> placement are not accepted and incorporated into
> the IEP that does not necessarily constitute an
> IDEA violation. Id. The court further concluded
> that the parents were not denied significant
> input in their child's IEP when there was
> frequent contact between parents and school
> staff, the parents actively participated in IEP
> meetings, and the parents' suggestions were taken
> seriously by the IEP team but were not
> implemented in the final IEP. Id. at 56.

B.B. ex rel. J.B. v. Haw., Dep't of Educ., 483 F. Supp. 2d 1042,

1050-51 (D. Hawai`i 2006) (footnote omitted).

As noted by the Hearings Officer, Mother was present

at all of the IEP team meetings that ultimately resulted in the

formulation of the 3/18/21 IEP. J.M.'s Treating Psychologist

and personnel from the Private Center also attended those team

meetings. See Decision, AR at 567 (dkt. no. 12-53 at

PageID.669) (noting attendance at the 10/20/20 IEP team

meeting); id. at 570 (dkt. no. 12-53 at PageID.672) (11/12/20

IEP team meeting attendance); id. at 573 (dkt. no. 12-53 at

PageID.675) (12/3/20 IEP team meeting attendance); id. at 586-87

(dkt. no. 12-53 at PageID.688-89) (2/25/21 IEP team meeting

attendance); id. at 592 (dkt. no. 12-53 at PageID.694) (3/18/21
IEP team meeting attendance).  The Hearings Officer heard seven
days of testimony and made extensive findings of fact regarding
these five IEP team meetings.  See Decision, AR at 567-81 (dkt.
no. 12-53 at PageID.669-83); id., AR at 586-97 (dkt. no. 12-53
at PageID.688-99).  While the length of the hearing and the
decision alone do not establish that a hearings officer's
factual findings were thorough and careful, see M.C., 858 F.3d
at 1194-95, in this case, the Hearings Officer's extensive
findings of fact about the five meetings that resulted in the
3/18/21 IEP are consistent with this Court's review of the
record.  This Court, therefore, in the exercise of its
discretion, accords deference to the Hearings Officer's factual
findings regarding the five IEP team meetings.

     The Hearings Officer's factual findings regarding the
five IEP team meeting are supported by the record and show that
the team engaged in extensive discussion of the components of
J.M.'s IEP.  Mother, J.M.'s Treating Psychologist, and Private
Center personnel provided input that was considered by the IEP
team, but the team ultimately disagreed with Mother's positions.
The record does not indicate that the DOE members of the IEP
team failed to take seriously the concerns raised by Mother,
J.M.'s Treating Psychologist, and the Private Center personnel.
This Court therefore concludes that the Hearings Officer did not

err in ruling that Plaintiff failed to establish that J.M. was denied a FAPE either because Mother was denied the opportunity to have meaningful participation in the IEP team meetings or because the team failed to consider evidence presented to it.

### D.   **Transition Planning**

Plaintiff argues J.M. was denied a FAPE because Mother did not participate in the planning for J.M.'s transition from the Private Center to the Home School and because the 3/18/21 IEP itself did not include a plan for that transition.

The 3/30/21 PWN states the Home School Principal informed Mother that a transition meeting would be scheduled, and a visit to the Home School programs could be scheduled before the transition meeting.  [3/30/21 PWN, AR at 285 (dkt. no. 13-5 at PageID.845).]  As noted by the Hearings Officer, at the conclusion of the March 18, 2021 IEP team meeting, Private Center Administrator requested a visit to the Home School and the Dream Center for Mother, Treating Psychologist, Private Center Administrator, and Private Center Executive Director.[19] See Decision, AR at 596 (dkt. no. 12-53 at PageID.698) (citing Petitioners' Exh. 7.5 at 1:31:37-1:31:54).  After the team

---

[19] Private Center Administrator refers to Howard Greenberg, and Private Center Executive Director refers to Denise Greenberg.  [Decision Legend, AR at 533 (dkt. no. 12-53 at PageID.635).]

meeting, Home School staff attempted to schedule the visit, using the suggested dates provided by Treating Psychologist at the IEP team meeting, and April 16, 2021 was ultimately proposed for the visit.  See Respondents' Exh. 144, AR at DOE 927 (dkt. no. 16-71 at PageID.1774) (email, dated 3/25/21, from Special Education Teacher 2,[20] to Mother, Treating Psychologist, Private Center Executive Director and others).

In early April 2021, Mother and the Home School Principal continued to communicate about Mother's concerns regarding the 3/18/21 IEP.  See Petitioners' Exh .4.29, AR at 552-553 (dkt. no. 15-20 at PageID.1066-67) (email dated 4/5/21 from Mother to Home School Principal); Respondents' Exh. 152, AR at 979-83 (email dated 4/7/21 from Home School Principal to Mother).

Around that time, Mother requested an informal visit to the Dream School, apart from the visit discussed at the 3/18/21 IEP team meeting, for her, J.M.'s grandmother, and Private Center Administrator, and she stated that they preferred that the visit be while school was in session.  See Respondents'

---

[20] Special Education Teacher 2 or "SPED Teacher 2" refers to Kaleo Waiau.  [Decision Legend, AR at 533 (dkt. no. 12-53 at PageID.635).]  During the relevant periods, Kaleo Waiau was the Department Chair for the Home School's Special Education Department.  See, e.g., Petitioners' Exh. 4.38, AR at 580-81 (dkt. no. 15-22 at PageID.1073-74) (6/8/21 email from SPED Teacher 2 to Mother).

Exh. 153, AR at DOE 984 (dkt. no. 16-77 at PageID.1809) (email dated 4/9/21 from Mother to SPED Teacher 2, requesting a visit by 4/14/21). Although DOE personnel were open to such a visit, there were concerns about the restrictions that were in place at the time, based on the health guidance for the COVID-19 surge. See id. at DOE 984-94 (email chain dated 4/9/21 and 4/12/21 between, inter alia, SPED Teacher 2, Home School Principal, and DOE DES,[21] discussing how the Home School should respond to Mother's request); Transcript of Proceedings Volume VII (taken 9/30/21) ("Trans. VII"), filed under seal 1/11/22 (dkt. no. 23), at 1078-80 (dkt. no. 23-1 at PageID.3437-39) (DOE DES's testimony discussing Respondents' Exh. 153, including that at the time of those emails there was "a spike in COVID cases" and visitors were not being allowed at the Dream School). Mother was offered other options, including the opportunity to visit the Dream School when school was not in session because, "[a]t th[at] time the DOE was not supposed to have any visitors to [the Home School] campus" and they "were trying to minimize [their] exposure to COVID." [Trans. VII at 1081-82 (dkt.

---

[21] DOE DES refers to DOE District Educational Specialist Tracy Lui. [Decision Legend, AR at 532 (dkt. no. 12-53 at PageID.634).]

no. 23-1 at PageID.3440-41) (DOE DES's testimony about an email to Mother offering three options).[22]]

In addition, there were other scheduling issues that arose around the time that discussion about a scheduled visit was occurring.  See Respondents' Exh. 156, AR at DOE 999-1000 (emails from 4/19/21 to 4/22/21 between DOE DES and Mother, stating Mother was not available for the suggested times during the week of 4/20/21 for the resolution session associated with her due process complaint because of a medical procedure scheduled that week); Petitioners' Exh. 4.38, AR at 580-81 (dkt. no. 15-22 at PageID.1073-74) (6/8/21 email from SPED Teacher 2 to Mother regarding her 6/7/21 email requesting to visit the Dream School and noting that the Dream School was closed for the summer and the head teacher for the school had retired); Petitioners' Exh. 4.45, AR at 594-96 (dkt. no. 1084-86) (emails between SPED Teacher 2 and Mother from 6/9/21 to 6/11/21, noting that SPED Teacher 2 would be out of town from 6/15/21 to 7/2/21 and that the proposed visit on Monday, June 14 could not go

---

[22] The Respondents' exhibit that is referred to during this portion of DOE DES's testimony is not included in the administrative record.  However, that exhibit appears to have been the same as Petitioners' Exhibit 4.31.  See AR at 558-60 (dkt. no. 15-21 at PageID.1069-71) (email dated 6/14/21 from Mother to Plaintiff's counsel, forwarding an email dated 4/13/21 from SPED Teacher 2 to, inter alia, Mother, Home School Principal, and DOE DES).

forward, in part because of Mother's delay in responding to the 6/9/21 email).

Mother eventually stopped communicating with DOE personnel, see Trans. VII at 981 (dkt. no. 23 at PageID.3338), and a Dream School visit did not ultimately occur, id. at 1081 (dkt. no. 23-1 at PageID.3440).

The intent was to have a transition planning meeting after the Dream School visit.  See, e.g., Petitioners' Exh. 4.38, AR at 580-81 (dkt. no. 15-22 at PageID.1073-74) (6/8/21 email from SPED Teacher 2 to Mother).  Because the visit did not occur, the transition planning meeting did not occur.

First, the fact that the 3/30/21 IEP itself did not specify the transition plan for J.M.'s move from the Private Center to Home School does not mean the IEP failed to offer a FAPE.  See R.E.B. v. Dep't of Educ., 770 F. App'x 796, 798 (9th Cir. 2019) (holding that there was no violation of FAPE where the DOE addressed the parent's concerns at a transition planning meeting which was held after the formulation of the student's IEP).[23]  The DOE made reasonable attempts to schedule a Dream School visit for Mother, and intended to have the transition planning after the visit.  The visit was delayed for various

---

[23] The transition planning meeting was held on June 13, 2012, R.E.B., 770 F. App'x at 798, and the IEP was finalized at a May 9, 2012 meeting, R.E.B. v. Hawaii, Civil No. 13-00016 DKW-BMK, 2014 WL 1569450, at *1 (D. Hawai`i Apr. 16, 2014).

reasons, some attributable to the DOE and some attributable to
Mother.  Ultimately, the attempts to schedule the visit and the
transition meeting stopped because Mother stopped communicating
with DOE staff.  Under the circumstances of this case, this
Court cannot conclude that the Hearings Officer erred in
concluding that Petitioners failed to establish that either the
lack of a transition plan or the fact that Mother did not
participate in a transition planning meeting resulted in the
denial of a FAPE.  See Decision, AR at 627 (dkt. no. 12-53 at
PageID.729).  Plaintiff's Appeal is denied and the Hearings
Officer's Decision is affirmed as to the issue related to
transition planning.

### E.   **CAS Services**

Plaintiff argues J.M. was not offered a FAPE because
the CAS services provided for in the 3/18/21 IEP were
insufficient to meet J.M.'s needs.  The gist of Plaintiff's
argument is that J.M. could not receive a FAPE unless he was
provided with IIS services.

As noted *supra* Discussion Section II.B, pursuant to
the system-wide policy change described in the 9/6/19 IIS Memo,
the DOE will only provide IIS services "to address intensive
behavioral needs" - not to address "non-behavioral needs such as
personal or self-care" - and IIS services "should only be
provided when a student is in need of full-time uniquely

42

designed behavior interventions to access academic and
nonacademic activities during the school day." [Respondents'
Exh. 170, AR at DOE 1059 (dkt. no. 16-80 at PageID.1826).]

J.M. was working with an RBT at the Private Center,
and Private RBT1 had been working with J.M. for four years.
[Trans. II at 265 (dkt. no. 18-1 at PageID.2614).]  Private RBT1
described the one-on-one support she provided to J.M. as
follows:

> so I'm with [J.M.] throughout the whole day, with
> the exception of lunch.  Lunch he's -- Typically
> he shares lunch with his peers. . . .  But the
> whole day, so from 9 a.m. to 3 p.m. he and I are
> working together and checking in with each other.
>
> And I mean, during his tutoring sessions
> where he's two-to-one, I'll just make sure that
> he's getting regular breaks.  And I'll make sure
> that he's doing okay and that we're checking in
> to making sure that he's regulated.

[Id. at 269-70 (dkt. no. 18-1 at PageID.2618-19).]  She watches
for triggers in the surrounding environment and for J.M.'s body
cues which may indicate that he is having intrusive thoughts,
and she also relies on J.M.'s self-reports about such incidents.
[Id. at 272-74 (dkt. no. 18-1 at PageID.2621-23).]

> I consistently check in with him and ask him, you
> know, how things are going, what's going on with
> him.  Is there anything, you know, bothersome or
> anything that we need to avoid.  What in the
> environment do you need.  Like what would make
> you feel safe and secure.
>
> And then beyond that, if it is intrusive
> thoughts, if it's something that's sort of like

> mental, something happening internally, then I'm
> watching his body language and trying to make
> sure For instance, if it's something that's
> frustrating him or challenging for him and he's
> feeling to a point where he may have a meltdown,
> I'll make sure that, you know, I take a moment
> and ask if he needs a break.  I'll ask the tutor
> to sort of wait a second.  And we can evaluate
> from there.

[Id. at 274 (dkt. no. 18-1 at PageID.2623).]  The types of
support services that Private RBT1 provides to J.M. are similar
to the services included within the CAS services specified in
the 3/18/21 IEP.  See Petitioners' Exh. 1.22 (3/18/21 IEP), AR
at 276-77 (dkt. no. 13-4 at PageID.835-36).]  While it is
understandable that Plaintiff would prefer to have J.M. continue
working with Private RBT1 at the Private Center, given the well-
established relationship between Private RBT1 and J.M., the
relevant question is whether the program described in the
3/18/21 IEP was **reasonable**, not whether it is was **ideal**.  See
Endrew F., 137 S. Ct. at 999 ("review of an IEP must appreciate
that the question is whether the IEP is **reasonable**, not whether
the court regards it as ideal" (emphasis in Endrew F.) (citation
omitted)).  Having reviewed the record de novo, this Court
cannot conclude that the Hearings Officer erred in ruling that
the inclusion of CAS services in the 3/18/21 IEP was a reduction
in services that resulted in the denial of a FAPE.  Plaintiff's
Appeal is denied as to that issue, and the Hearings Officer's
Decision is affirmed.

**F.   Whether J.M.'s IEP Should Have Been Formulated
      in Conjunction with His Triennial Evaluation**

Plaintiff argues J.M. was not offered a FAPE because the IEP team should not have created J.M.'s IEP until after the completion of his triennial evaluation.

The IDEA requires that a child with a disability to be reevaluated "at least once every 3 years, unless the parent and the local educational agency agree that a reevaluation is unnecessary." 20 U.S.C. § 1414(a)(2)(B)(ii). Here, it is undisputed that a triennial evaluation was necessary. The gist of Plaintiff's argument is that the formulation of J.M.'s IEP should have been conducted after the completion of the triennial evaluation to allow the DOE time to conduct an FBA so that IIS services could be included in the IEP. This Court has affirmed the Hearings Officer's ruling that the CAS services included in the 3/18/21 IEP were sufficient to meet J.M.'s needs. Thus, the DOE's refusal to delay the formulation of the J.M.'s IEP so that the team could consider an FBA conducted during the triennial reevaluation did not result in the denial of a FAPE. The Hearings Officer's ruling on this issue is therefore affirmed.

**G.   Adequacy of the 3/30/21 PWN**

Plaintiff's final argument is that J.M. was not offered a FAPE because the 3/30/21 PWN was inadequate.

This district court has stated:

> The IDEA, 20 U.S.C. § 1415(b)(3), requires
> written notice to the parents of a child when the
> DOE proposes to change the child's educational
> placement.  "Once a placement has been made,
> agreed to, or determined to be appropriate after
> an administrative hearing, a school system
> proposing to change the educational placement of
> a student in special education must provide
> written notice to the student's parents,
> including a full explanation of all procedural
> safeguards available to them, an explanation of
> why the school system proposes to take the
> action, and a description of any factors relevant
> to the school system's decision."  Petties v.
> District of Columbia, 881 F. Supp. 63, 65 (D.D.C.
> 1995); see 34 C.F.R. 300.503(b) (delineating the
> information required in the prior written
> notice).

Mary T. v. Dep't of Educ., CIVIL NO. 05-00772 HG-BMK, 2007 WL

9770405, at *6 (D. Hawai`i Mar. 22, 2007).  The requirements in

34 C.F.R. § 300.503(b) are:

> (1)  A description of the action proposed or
> refused by the agency;
>
> (2)  An explanation of why the agency proposes or
> refuses to take the action;
>
> (3)  A description of each evaluation procedure,
> assessment, record, or report the agency used as
> a basis for the proposed or refused action;
>
> (4)  A statement that the parents of a child with
> a disability have protection under the procedural
> safeguards of this part and, if this notice is
> not an initial referral for evaluation, the means
> by which a copy of a description of the
> procedural safeguards can be obtained;
>
> (5)  Sources for parents to contact to obtain
> assistance in understanding the provisions of
> this part;

> (6)  A description of other options that the IEP
> Team considered and the reasons why those options
> were rejected; and
>
> (7)  A description of other factors that are
> relevant to the agency's proposal or refusal.

Having reviewed the 3/30/21 PWN and the record de novo, this Court concludes that the 3/30/21 PWN satisfies these requirements.  Plaintiff's challenge to the sufficiency of the 3/30/21 PWN is rejected, and the Hearings Officer's Decision is affirmed as to this issue.

**H.   <u>Rulings on FAPE Issues</u>**

All of Plaintiff's arguments asserting a denial of FAPE are rejected, and this Court affirms the Hearings Officer's ruling that Petitioners failed to prove a denial of FAPE.

<u>**CONCLUSION**</u>

For the foregoing reasons, the Court HEREBY DENIES Plaintiff's Appeal and AFFIRMS the Hearings Officer's November 1, 2022 Findings of Fact, Conclusions of Law and Decision.  There being no remaining issues in this case, the Court DIRECTS the Clerk's Office to close this case and enter judgment in favor of the DOE on **January 13, 2023,** unless Plaintiff files a timely motion for reconsideration of this Order.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAII, December 29, 2022.



/s/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States District Judge

**JAMES MANDEVILLE VS. DEPARTMENT OF EDUCATION, ET AL; CV 21-00468 LEK-WRP; ORDER DENYING PLAINTIFF'S APPEAL AND AFFIRMING THE HARINGS OFFICER'S NOVEMBER 1, 2021 FINDINGS OF FACT, CONCLUSIONS OF LAW AND DECISION**